UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JILL SCHWARTZ,

    *Plaintiff*,

v.

ALEXANDRA THOMAS SCHWARTZ,

    *Defendant*.

Civil Action No. 1:19-cv-00340 (CJN)

**MEMORANDUM OPINION**

Jill Schwartz, a real estate agent in the D.C. Metropolitan area, filed this lawsuit against her former colleague Alexandra Thomas Schwartz. *See generally* Am. Compl., ECF No. 40. Thomas Schwartz (Thomas for short) responded with several counterclaims. *See generally* Def.'s Ans. & Countercls. ("Def.'s Ans."), ECF No. 41. Both Schwartz and Thomas have now moved for summary judgment. *See generally* Pl.'s Mot. for Summ. J. ("Pl.'s Mot."), ECF No. 57; Def.'s Cross-Mot. for Summ. J. ("Def.'s Mot."), ECF No. 59. For the following reasons, the Court grants summary judgment to Thomas as to all of Schwartz's claims, and to Schwartz as to Thomas's false advertising and tortious interference counterclaims. But the Court denies Schwartz's motion for summary judgment as to Thomas's defamation counterclaim and her unfair competition counterclaim.

    **I.**    **Background**

Schwartz initiated this suit when she sued her former broker, Urban Compass, Inc., and three of her former team members: Thomas, Danielle Spira, and Raymond Ferrara. Schwartz's dispute with Compass has since gone to arbitration and her claims relating to Spira and Ferrara have been resolved. *See* Order, ECF No. 63. That leaves Thomas as the lone Defendant. *Id.*

1

Schwartz joined Compass in August 2016.  Her Independent Contractor Agreement provided her with office space, marketing, and technical support in exchange for fifteen percent of her commissions.  Am. Compl. ¶¶ 8, 45; *see also* Jill Schwartz's ICA, ECF No. 27-2.  Over the course of the next year, Schwartz recruited Thomas, Spira, and Ferrara to form the "Jill Schwartz Group."  Am. Compl. ¶¶ 10–13.

In February 2017, Schwartz appointed Thomas as Senior Vice President of the Group.  *Id.* ¶ 15.  Thomas, like Schwartz, signed her own Independent Contractor Agreement with Compass.  *See generally* Thomas's ICA, ECF No. 47-2.  She also signed a "Team Contract" with Schwartz, which detailed (1) the commission splits among the team members and (2) the support provided by the Group (including access to the Group's digital assets and marketing materials).  *See* Team Contract ("Team Contract"), ECF No. 20-1 at 2.  The agreement permitted Thomas to utilize the Group's customer relation management system and its marketing database to "target market her sphere of influence."  *Id.*  It also provided that, in the event of a member of the team's dissolution, all the Group's "internal plans, procedures, processes and group infrastructure [would] remain completely confidential," and the "CRM Database that house[d] the client names [would] revert to the original client ownership profile."  *Id.* at 3.

In the summer of 2018, the team members informed Schwartz of their intention to leave.  Def.'s SOMF ("Def.'s SOMF"), ECF No. 59-1 at ¶¶ 37, 41.  Schwartz and the team members agreed on a payout plan for the properties that were still under contract.  *Id.* ¶¶ 62–63.  After their departure, the team members co-listed three separate properties, but never formed a team of their own.  *Id.* ¶ 72.  Compass terminated Schwartz in October 2018; she now operates the Group through a different broker.  *Id.* ¶ 217.

Both Schwartz and Thomas claim that the other engaged in tortious conduct in the months surrounding the exit of the team members from the Group. Schwartz claims that Thomas exploited the Group's resources to steal listings and clients, *see generally* Am. Compl. In particular, Schwartz sues Thomas for (1) breach of contract, (2) conspiracy, (3) breach of a fiduciary duty, and (4) tortious interference with contract. *Id*. Thomas, on the other hand, claims that Schwartz, acting out of spite, stole credit for several of her listings and defamed her in emails sent to Compass management. *See generally* Def.'s Ans. She filed counterclaims for (1) false advertising, (2) defamation, (3) unfair competition, and (4) intentional interference with prospective economic opportunities. *Id*.

Schwartz has moved for summary judgment on all four of Thomas's counterclaims. *See generally* Pl.'s Mot. Thomas has filed her own motion for summary judgment, seeking judgment in her favor on both her own counterclaims and all of Schwartz's claims against her.[1] *See generally* Def.'s Mot.

## II.   Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute about a material fact is not 'genuine' unless 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Mogenhan v. Napolitano*, 613 F.3d 1162, 1165 (D.C. Cir. 2010) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "When the moving party does not bear the burden of persuasion at trial, its burden 'may be discharged by showing—that is, pointing out to the district court—that there is an absence of

---

[1] Thomas and the other team members filed a joint motion for partial judgment on the pleadings. *See* Mot. for J. on the Pleadings, ECF No. 47. That motion is now moot in light of both Thomas's cross-motion for summary judgment and the other team members' dismissal from the case. *See* Def.'s Mot.

evidence to support the nonmoving party's case.'" *Mokhtar v. Kerry*, 83 F. Supp. 3d 49, 60–61 (D.D.C. 2015) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). After the moving party has met its burden, the nonmoving party must designate "specific facts showing that there is a genuine issue for trial" to defeat the motion. *Celotex*, 477 U.S. at 324. Though the Court "may not resolve genuine disputes of fact in favor of the party seeking summary judgment," *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (citation omitted), the nonmoving party must show more than "[t]he mere existence of a scintilla of evidence in support of its position," *Anderson*, 477 U.S. at 252. In other words, "there must be evidence on which the jury could reasonably find for [the nonmoving party]." *Id.* "[T]he determination of whether a given factual dispute requires submission to a jury must be guided by the substantive evidentiary standards that apply to the case." *Id.* at 255.

"Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2000) (quoting *Anderson*, 477 U.S. at 255). But the nonmoving party's opposition must consist of more than unsupported allegations or denials; they must be supported by facts from affidavits, declarations, or other competent evidence that show there is a genuine issue for trial. *See* Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324.

### III.   Analysis

#### A.   Schwartz's Claims against Thomas

##### a.   Breach of Contract

To prevail on a breach of contract claim, a plaintiff must prove: "(1) a valid contract between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of that duty; and (4) damages caused by [the] breach." *Xereas v. Heiss*, 987 F.3d 1124, 1130 (D.C. Cir. 2021) (citation omitted). When contract "language is clear and unambiguous, its plain language is relied

4

upon in determining the parties' intention." *GLM P'ship v. Hartford Cas. Ins. Co.*, 753 A.2d 995, 998 (D.C. 2000) (quotation marks and citations omitted).

Schwartz claims that Thomas breached various oral and written contracts with respect to listing agreements for two properties. Pl.'s Count IV Br., ECF No. 76 ¶¶ 1–2. To prevail, Schwartz must identify not only a contractual obligation that Thomas owed her but also a breach of that obligation. The Court turns first to the circumstances surrounding each listing agreement to show why Schwartz's claim fails.

**7537 12th St. NW.** In August 2018, a client signed a listing agreement with Compass for agents Thomas and Ferrara to represent him on the sale of 7537 12th St NW. *See* Def.'s SOMF ¶ 144. Following the team members' departure from the Group, the client and Schwartz agreed that Thomas would serve as the lead agent for the listing. *Id.* ¶ 147. The property sold for a purchase price of $1.2 million a couple months later. *Id.* ¶ 154. In her deposition, Schwartz acknowledged that, in accordance with the agreed-upon payout plan, she received 50% of the net commissions for that listing. *Id.* ¶ 155.

**6315 Broad Branch Rd.** Thomas represented the purchaser of 6315 Broad Branch Rd. pursuant to a Buyer Agency Agreement dated September 17, 2018. Pl.'s Count IV Br. at Ex. D. The transaction closed a month later at a purchase price of $1.2 million. Def.'s SOMF ¶ 193. In accordance with the payout agreement, Jill Schwartz did not receive a commission on this transaction. *Id.* ¶ 194.

\* \* \*

Schwartz has conceded that only the terms of the Team Contract govern the relationship between her and Thomas, meaning that no supposed oral agreement between the two is at issue here. Def.'s Opp'n to Pl.'s Mot. Summ. J., ECF No. 71 at 4–5. With that the case, Schwartz

claims that Thomas had a contractual obligation under the Team Contract to include her on both of the listings discussed above and that Thomas breached that obligation.  Am. Compl. ¶ 52.

The Team Contract, however, does not demand the inclusion of Schwartz on either listing. *See* Team Contract at 1.  The listing template does not even contain a line on which to notate Schwartz.  *Id.*  Sure, Thomas listed the Group on sales contracts while she was still a member of the team.  *Id.* at 7–8.  But Thomas had departed the Group before both listings were finalized, s*ee* Pl.'s Count IV Br. at Ex. B, Ex. D, meaning that Thomas could not have breached a duty owed to Schwartz or the Group because she had exited a contractual arrangement with both by that point.

Schwartz challenges this conclusion by asserting that the Team Contract required commission splits, which implies a general duty of loyalty to include Schwartz on both listings. *See* Team Contract at 1.  Schwartz, however, proffers no evidence from which a reasonable juror could conclude that the Team Contract required Thomas to include her on the listings.  What's more, splitting commissions is different from an obligation to include an agent on a listing. Schwartz has failed to show a genuine issue of material fact on her breach of contract claim, *see* Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324, which therefore requires summary judgment for Thomas on that claim.

### b.  Breach of a Fiduciary Duty

To succeed on a claim for breach of a fiduciary duty, a plaintiff must establish: "(1) the defendant owed plaintiff a fiduciary duty; (2) a breach of that duty; and (3) proximate cause and injury to be inferred from those facts."  *Xereas*, 987 F.3d at 1130 (citation omitted).  In some circumstances, "a fiduciary relationship could exist . . . where circumstances show that the parties extended their relationship beyond the limits of contractual obligations to a relationship founded upon trust and confidence."  *Id.* at 1132.  In determining whether a fiduciary relationship existed,

the Court must conduct a "searching inquiry into the nature of the relationship, the promises made, the types of services given, and the legitimate expectations of the parties." *Id.* at 1131 (citation omitted).

A fiduciary duty may also arise where an agency relationship exists. *Transamerica Leasing, Inc. v. La Republica De Venez.*, 200 F.3d 843, 849–50 (D.C. Cir. 2000) (quoting Restatement (Second) of Agency §1)). Whether an agency relationship exists "is a factual question for which the person asserting the relationship has the burden of proof." *Alkanani v. Aegis Def. Servs., LLC*, 976 F. Supp. 2d 1, 11 (D.D.C. 2013). Courts consider such factors as: "(1) the selection and engagement of the servant, (2) the payment of wages, (3) the power to discharge, (4) the power to control the servant's conduct, (5) and whether the work is part of the regular business of the employer." *Id.* (citation omitted). The inquiry searches for evidence of consent between the parties to establish a principle-agent relationship. *Henderson v. Charles E. Smith Mgmt., Inc.*, 567 A.2d 59, 62 (D.C. 1989). And the question often turns on evidence of the principle's right to control the agent, rather than its actual exercise. *Judah v. Reiner*, 744 A.2d 1037, 1040 (D.C. 2000).

Schwartz alleges that Thomas owed her a fiduciary duty and that Thomas breached that duty when she entered into listing agreements for the two properties. Pl.'s Count IV Br. ¶¶ 1–2. In particular, Schwartz contends that Thomas owed her a duty of loyalty under the terms of her employment agreement as well as under agency principles. Am. Compl. ¶ 60. But Schwartz has failed to proffer any evidence that Thomas owed her a fiduciary duty or, if such a duty existed, that she breached it.

Because the existence of a contract does not in and of itself create a fiduciary duty, *Xereas*, 987 F.3d at 1132, Schwartz must proffer evidence in addition to the Team Contract as the source

of that duty. The language of the Team Contract, however, goes a long way toward showing why Schwartz cannot come up with an additional source. The contract encourages team members to pursue their own self-interest, as it awards larger commission splits for independent transactions. Team Contract at 1. It also states that Thomas could access the Group's shared resources to "target market her sphere of influence," *id.*, and Schwartz has admitted that she allowed team members to "begin their own practice" while part of the Group. Def.'s Opp'n to Pl.'s Mot. for Summ. J., ECF No. 58 at 17. Schwartz points to nothing aside from the Team Contract to suggest a fiduciary duty existed. And the Team Contract itself suggests otherwise.

Schwartz turns to the law of agency in an attempt to salvage her claim. During oral argument, Schwartz explained that Thomas's position as Senior Vice President of the Group gave rise to an agency relationship. Oral Arg. Tr. 7:19–21. But Schwartz did not have the requisite control over Thomas to establish an agency relationship. It was Compass after all, not Schwartz, that hired Thomas. Def.'s SOMF ¶ 17. Thomas received her commissions from Compass. Def.'s Opp'n to Pl.'s Mot. for Summ. J., ECF No. 58 at 20. And Compass alone had the power to terminate her. *Id.* at 20–21. What's more, Thomas had no authority over the other team members. *Id.* Adding all that up leads to the conclusion that Schwartz has failed to proffer evidence sufficient to create a material fact regarding her control over Thomas sufficient to give rise to an agency relationship.

Even assuming that Thomas owed Schwartz a fiduciary duty, Schwartz has failed to proffer evidence from which a reasonable jury could conclude that Thomas breached that duty. Schwartz makes a bare assertion that Thomas's having listed both properties breached a fiduciary duty, but she fails to explain how that would constitute a breach even if such a duty existed. *See generally*

8

Am. Compl; Def.'s Opp'n; Pl.'s Count IV Br. The Court therefore grants summary judgment to Thomas as to Schwartz's claim of a breach of a fiduciary duty.

### c. Conspiracy

Civil conspiracy "depends on performance of some underlying tortious act," *Halberstam v. Welch*, 705 F.2d 472, 479 (D.C. Cir. 1983), which turns a civil conspiracy claim into a means "for establishing vicarious liability for the underlying tort," *id.* Establishing a claim of civil conspiracy when a plaintiff has suffered an underlying tortious act requires: "(1) an agreement between two or more persons, (2) to participate in an unlawful act, and (3) an injury caused by an unlawful overt act performed by one of these parties to the agreement in furtherance of the common scheme." *Id.* at 477.

Schwartz claims that Thomas and the other former team members "acted in concert and as part of a coordinated plan, motivated by greed, self-interest, and in direct contravention of their duty of loyalty, and their duty to use their best efforts on behalf of Plaintiff." Am. Compl. ¶ 56. As explained above, however, Schwartz proffers no evidence to show that Thomas owed her a fiduciary duty, and even if she did, Schwartz has not demonstrated a breach of that duty. Schwartz's claim of conspiracy therefore hinges on a purported agreement between Thomas and one of the former team members to breach a duty of loyalty owed to Schwartz. True, Thomas and the other team members did co-list three properties together after their departure from the Group. Def.'s SOMF ¶¶ 72. Yet that fact alone does not constitute evidence that the two parties contemplated an unlawful act or breached a duty of loyalty owed to Schwartz. Schwartz proffers no other facts to support her claim, and thus a reasonable jury could not conclude that that Thomas engaged in an unlawful civil conspiracy.

### d. Tortious Interference with Contract

To prevail on a claim of tortious interference with contract, a plaintiff must show: "(1) the existence of a contract; (2) knowledge of the contract; (3) intentional procurement of a breach of the contract; and (4) damages resulting from the breach." *IMark Mktg. Servs., LLC v. Geoplast S.p.A.*, 753 F. Supp. 2d 141, 163 (D.D.C. 2010).

Schwartz claims that Thomas tortiously interfered with her listing agreements. Am. Compl. ¶ 67. In particular, Schwartz argues that she secured listings for multiple properties and that Thomas interfered with them. *See* Pl.s' Opp'n Def.'s Mot. Summ. J., ECF No. 71 at 7. Yet Schwartz has not produced evidence to suggest that the listings she purportedly secured for these properties were valid contracts. Nor has Schwartz demonstrated that she would have taken the lead on these alleged contracts but-for Thomas's interference.[2]

### B. Thomas's Counterclaims against Schwartz

Thomas counterclaims for false advertising, defamation, unfair competition, and tortious interference with business expectancy. The Court addresses each claim in turn.

### a. False Advertising

The Lanham Act creates a federal cause of action against those who publish false or misleading information in connection with interstate commerce. *See* 15 U.S.C. § 1125(a)(1)(B).

---

[2] Schwartz initially brought a claim of tortious interference with contract, Am. Compl. ¶¶ 64–69, but later recast the claim as a tortious interference with business expectancy. *See* Pl.s' Opp'n Def.s' Mot. Summ. J., ECF No. 71 at 7. Tortious interference with business expectancy is a distinct tort in the District of Columbia and is not interchangeable with tortious interference with contract. *See, e.g.*, *Banneker Ventures, LLC v. Graham*, 798. F3d 1119, 1134 (D.C. Cir. 2015) (alleging both tortious interference with contract and tortious interference with prospective business advantage and stating different standards for both). Had Schwartz's claim of tortious interference with business expectancy been properly before this Court, the result would have been identical. To state a claim of tortious interference with business expectancy, a plaintiff must plead: "(1) the existence of a valid business relationship or expectancy, (2) knowledge of the relationship or expectancy on the part of the interferer, (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy, and (4) resultant damage." *Jankovic v. Int'l Crisis Grp.*, 593 F.3d 22, 29 (D.D.C. 2017) (citation omitted). Schwartz has failed to present evidence that the listings constituted a valid relationship or expectancy such that a claim for tortious interference would have withstood a motion for summary judgment. *See* Pl.'s Opp'n at 7.

10

To prevail on a Lanham Act claim for false advertising, a plaintiff must show that the defendant made statements of fact in her commercial advertising promotion that were: "(1) false or misleading, (2) actually or likely deceptive, (3) material in their effects on buying decisions, (4) connected with interstate commerce, and (5) actually or likely injurious to the plaintiff." *Fernandez v. Jones*, 653 F. Supp. 2d 22, 31–32 (D.C. Cir. 2009) (citation omitted).

Thomas asserts that Schwartz violated the Lanham Act when she published eight of Thomas's past listings as her own work. Def.'s Ans. ¶¶ 90–99. No one disputes that Schwartz has falsely claimed eight of Thomas's past transactions as her own in public records and on public websites. *Id.* ¶ 92. The false listings were likely deceptive in that potential clients credited Schwartz for Thomas's work. Def.'s Opp'n to Pl.'s Mot. Summ. J., ECF No. 58 at 28–29. And a sufficient nexus exists between Schwartz's falsified listings and interstate commerce. Indeed, Schwartz does not dispute the sufficiency of the nexus. *See Paleteria La Michoacana, Inc. v. Productos Lacteos Tocumbo S.A. De C.V.*, 743 F. App'x 457, 469 (D.C. Cir. 2018). So this claim boils down to whether the false listings were material in their effects on consumer buying decisions and whether Thomas suffered injury as a result.

Schwartz argues that, in order to demonstrate a material effect on buying decisions, Thomas must present evidence that consumers likely saw the false information advertised or that they factored the false information into their decision-making. Pl.'s Mot. at 4. Thomas responds that where, as here, published representations are literally false, both actual deception and materiality are presumed. Def.'s Opp'n to Pl.'s Mot. Summ. J., ECF No. 58 at 29. But falsity alone does not suffice. *See, e.g.*, *Paleteria*, 743 F. App'x at 470 (holding that the plaintiff's false advertising claim failed because they could not prove that any consumer had seen the false statements, let alone that the information factored into the "decision whether to purchase [the

11

product]."); *Aristotle Int'l., Inc. v. NGP Software, Inc.*, 714 F. Supp. 2d 1, 14 (D.C. Cir. 2010). Thomas has not proffered any evidence that Schwartz's false representations had a material effect on buying behavior. Even where a plaintiff offers expert testimony in support of a material effect on buying behavior, courts in this district have found such evidence insufficient when not supported by additional data demonstrating a causal link between the false information and consumer decision-making. *See, e.g.*, *Paleteria* 43 F. App'x at 469–70. Because Thomas has put forth inadequate evidence to suggest that Schwartz's falsified listing motivated a client to hire Schwartz, she cannot defeat Schwartz's motion on this claim.

Thomas has also failed to proffer evidence of "an injury to a commercial interest in reputation or sales." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 119 (2014) (internal citations omitted). She contends that, although unable to calculate monetary damages or lost profits, her reputational injury alone suffices. But the law requires more: Thomas must support her false advertising claim with a showing of actual damage. *See, e.g.*, *ALPO Petfoods, Inc. v. Ralston Purina Co.*, 913 F.2d 958, 969 (D.C. Cir. 1990); *Paleteria La Michoacana, Inc. v. Productos Lacteos Tocumbos S.A. De C.V.*, 69 F. Supp. 3d 175, 218 (D.D.C. 2014) (stating that a party pursuing monetary damages for false advertising under the Lanham Act must establish actual damage). She has not done so.

### b. Defamation

For a statement to be actionable as defamatory, it must at least express or imply a verifiably false fact about the plaintiff. *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 19–20 (1990). And while statements of opinion regarding matters of public concern cannot be defamatory if they do not contain or imply a provably false fact, they are actionable if they imply a provably false fact or rely upon stated facts that are provably false. *Id.* at 20. "In deciding whether a reasonable

factfinder could conclude that a statement expressed or implied a verifiably false fact about [the plaintiff], the court must consider the statement in context." *Weyrich v. New Republic, Inc.*, 235 F.3d 617, 624 (D.C. Cir. 2001).

Thomas argues that Schwartz made defamatory statements about her in a series of emails to Compass management. *See* Def.'s Opp'n to Pl.'s Mot. Summ. J., ECF No. 58 at 33–40. In the wake of the team members' departure from the Group, Schwartz exchanged a number of emails with Compass management calling the team members "[c]heats, liars, [and] thieves," and stating that they had engaged in "[u]nethical documented behavior" including "stealing deals, self-approving commission, failing to upload contracts to keep them off the business center." *Id.* at 34–35.

Though Schwartz contends that these statements were merely opinions expressed in the heat of the moment and not actionable statements of fact, Oral Arg. Tr. 27:5, this Court concludes that a genuine issue of material fact exists over whether Schwartz's statements were defamatory. A reasonable reader, for example, might have taken "cheats, liars, and thieves" to signify Schwartz's discontent with the dissolution of the Group. But a reasonable reader (and therefore juror) could also interpret the words as accusing Thomas of serious misconduct (which Thomas claims did not happen). So too with the accusation that the team members were "stealing deals." A reasonable juror could interpret the statement as nothing more than jealousy, or a juror could view the statement as an accusation of unethical conduct. All in all, a reasonable juror *could* conclude that these comments were defamatory statements of fact. Schwartz's motion for summary judgment on this claim is therefore denied.

### c. Unfair Competition

The law does not define unfair competition in terms of specific elements, but rather "by various acts that would constitute the tort if they resulted in damages." *K&D LLC v. Trump Old Post Off. LLC*, 951 F.3d 501, 509 (D.C. Cir. 2020) (citation omitted). Those acts may include "defamation, disparagement of a competitor's goods or business methods," and "interference with access to the business." *Intelsat USA Sales Corp. v. Juch-Tech, Inc.*, 935 F. Supp. 2d 101, 120 (D.D.C. 2013) (quoting *B & W Mgmt., Inc. v. Tasea Inv. Co.*, 451 A.2d 879, 881 n.3 (D.C.1982)). Thomas's unfair competition counterclaim rests on her defamation counterclaim, as she argues that the act underlying her unfair competition claim is Schwartz's defamatory statements. *See* Def.'s Opp'n to Pl.'s Mot. Summ. J., ECF No. 58 at 45. Given the symbiotic relationship between Thomas's counterclaims of defamation and unfair competition, the Court cannot grant summary judgment as to the unfair competition counterclaim when a genuine issue of material fact exists with regards to the underlying relevant tort. *Intelsat*, 935 F. Supp. 2d at 120.

### d. Tortious Interference with Business Expectancy

Thomas withdrew her opposition to Schwartz's motion for summary judgment as to her tortious interference with business expectancy counterclaim. Oral Arg. Tr. 50:1–3. The Court therefore grants Schwartz's motion as to that claim. *See e.g.*, *Dawn J. Bennett Holding, LLC v. FedEx TechConnec, Inc.*, 217 F. Supp. 3d 79, 82 (D.D.C. 2016).

### IV. Conclusion

For the foregoing reasons, Schwartz's Motion for Summary Judgment is **GRANTED** as to Thomas's false advertising and tortious interference with business expectancy counterclaims. But it is **DENIED** as to Thomas's defamation and unfair competition counterclaims. Thomas's Motion for Summary Judgment is **GRANTED** as to Schwartz's breach of contract, breach of a fiduciary duty, conspiracy, and tortious interference with contract claims. And Thomas's Motion to take

judicial notice of a couple exhibits is **DENIED** as **MOOT**.  An Order will be entered contemporaneously with this Memorandum Opinion.

DATE:  October 6, 2021

CARL J. NICHOLS
United States District Judge